UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TANNER WIGGINS, as father and legal
Guardian of A.W., a minor,

      Plaintiff,                             CASE NO.:  3:16-cv-1142-TJC-MCR

vs.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

      Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO GEICO'S MOTION FOR SUMMARY JUDGMENT (DKT. 48)**

**COMES NOW**, the Plaintiff, TANNER WIGGINS, as father and legal Guardian of A.W., a minor, as ("Plaintiff" or "Wiggins"), by and through his undersigned counsel, requests that this Honorable Court deny Defendant, GOVERNMENT EMPLOYEES INSURANCE COMPANY's ("GEICO") Motion for Summary Judgment (Dkt. 48).

## I.    **INTRODUCTION**

This insurance bad faith action arises out of an auto accident wherein GEICO's insured, Brandon Clayton, severely injured a three-year-girl, A.W.  GEICO issued an auto liability insurance policy to Brandon Clayton's parents, Christopher and Shelly Clayton, with per person bodily injury limits of $25,000 per person, $50,000 per accident ("the policy").  (Dkt. 9-1 at 3 to 4). On September 13, 2013, a final judgment in the amount of $468,611.33 was entered against Christopher Clayton and in favor of Wiggins. (Dkt. 9-3).

Very shortly after the accident, GEICO understood that due to the severity of A.W.'s injuries and the clear liability of its insureds, it would need to attempt to settle this claim for its

relatively minimal policy limits.

Wiggins alleges GEICO failed to settle his claims by improperly including a hospital as a payee on the settlement check, seeking to release GEICO as a party without any legal right to do so, and delaying correcting its improper settlement terms for nearly two months after Wiggins' attorney informed GEICO of conditions necessary for settlement. GEICO also failed to sufficiently communicate to its insureds the seriousness of the claims against them and of steps they should take to avoid an excess judgment. Evidence in this case reveals that GEICO's breaches of its good faith obligations were the result of institutional failures which demonstrate reckless disregard for its insureds' interests. These failures include a lack of proper staffing and supervision of its claims personnel, even when it knew such personnel were not able to promptly handle their claims and were making too many mistakes.

## FACTS

The following are the facts in the light most favorable to Wiggins as the nonmoving party opposing GEICO's motion for summary judgment.

**GEICO quickly realized the severity of A.W.'s claim and that it should be settled for policy limits**

On October 22, 2008, Christopher Clayton's son, Brandon Clayton, was permissively driving his father's automobile. Brandon negligently rear ended the car in which 3-year-old A.W. was a passenger. The Florida Traffic Crash Report cited Brandon Clayton for careless driving. (Dkt. 26-1). A.W. was airlifted from the accident scene to the hospital. (Dkt 26-2 at 2, entry of 10/22/08 at 12:28 p.m.).

GEICO was notified of the accident the same day it occurred. (Dkt. 26-2 at 1). GEICO assigned an adjuster, Shenley Toadvine, to handle the claim. (Dkt. 26-2 at 1, entry of 10/22/08 at

12:27 p.m.).

On October 28, 2008, six days after the accident, GEICO's management determined the exposure on A.W.'s claim necessitated tender of the $25,000 bodily injury policy limits based on the facts that A.W. was airlifted to a hospital and transferred to Shands, where she was still being hospitalized.  (Dkt 26-2 at 10, entry of 10/28/08 at 11:13 a.m.).   The helicopter bill and hospitalization alone would have exceeded the policy limits, regardless of any injury claim A.W. may have suffered.  (Deposition of Allen Yates, p. 25).

**GEICO's unexcused delays and mishandling of A.W.'s claim**

On October 31, 2008 GEICO mailed a cover letter, which enclosed a settlement check and release[1] ("GEICO settlement offer") to the Wiggins' attorney, John Arnold ("Arnold").  (Dkt. 26-3).  The GEICO settlement offer was received by Arnold's office on November 3, 2008.  **Exhibit A**, Burnetti Notes at 0081).  The letter stated that Shands Hospital was included as a payee on the settlement check because **"Alachua County Ordinance requires inclusion of Shands Hospital on any settlement check issued to a person who has been treated by either hospital unless the hospital's bill has been paid."**  (Dkt. 26-3 at 1).

The release listed the following parties to be released: Shelly Clayton, Christopher Clayton, Brandon Clayton, GEICO Insurance Company, and all officers, directors, agents or employees of the foregoing, their heirs, executors, administrators, agents or assigns. (Dkt. 26-3 at 2).  The only two parties who faced legal liability and were insured by GEICO's policy were Christopher Clayton and Brandon Clayton.

---

[1] Though the letter was drafted on October 28th, and is dated October 28th, it was delayed because Ms. Toadvine had the check reissued to include Shands hospital per her supervisor's instructions. (See Dkt 26-2 at 11, note of 10/28/08 at 12:48 a.m.).  The check attached to the letter is dated 10/31/08, and it is undisputed the check was enclosed with the letter.  (Dkt. 26-3 at 4).

On November 18, 2008, Arnold had a phone call with Lindsay Walsh, who was Tanner Wiggins' then-girlfriend (now his wife), who was taking a large role in taking care of A.W., including medical and legal issues in connection with the accident.  (**Ex. A**, Burnetti Notes at 0080).  Arnold advised Ms. Walsh that GEICO's limits had been tendered to A.W., but they will need to get approval for her settlement, including an equitable distribution to Medicaid, the rehabilitation center treating A.W., and Arnold's fees and costs.  Arnold stated that whatever his fees were, they can reduce them to get the clients some money to help care for A.W.  *Id*.  It was Arnold's expectation at that time the case would settle for the $25,000 policy limits.  (Dkt. 48-17 at 30, pp. 114-115).

On December 1, 2008, Ms. Toadvine was advised by Arnold's office that A.W. was still in the hospital.  (Dkt 26-2 at 24, entry of 12/01/08 at 9:06 a.m.)

On December 4, 2008, Arnold sought an asset check on the Clayton family.  Early on in the claim, he had advised the clients that the Claytons would likely be "judgment proof", given the difficulty of recovering from people in Florida, and the fact the vehicle driven by the tortfeasor was a 1998 GMC.  (**Ex. A**, Burnetti Notes 0081; Dkt. 48-17 at 10, p. 35).  He also drafted a letter to GEICO returning the check tendered to A.W. for including Shands on it and for unacceptable settlement terms.  (**Ex. A**, Burnetti Notes at 0080).  Arnold testified that in the 26 years he's been practicing law, this was the only time he had ever had an insurer put a hospital on a check.  (Dkt. 48-17 at 8, p. 28).

On December 5, 2008, Arnold sent a letter responding to the GEICO settlement offer.  (Dkt. 26-4).  Arnold's letter set forth three conditions necessary to settle the bodily injury claim of A.W.  First, Shands needed to be removed from the check, as Arnold stated he found no ordinance

requiring Shands to be a payee on an insurance settlement.  *Id.*  He requested GEICO to produce the claimed Ordinance referenced in the GEICO settlement offer.  *Id.*

Second, Arnold objected to listing of additional parties beyond the owner and driver of the involved vehicle (Christopher Clayton and Brandon Clayton) on the release to be executed by his client.  *Id.*  Therefore, he requested that Shelley Clayton, GEICO, and "all officers, directors, agents, or employees" be removed from the release.  *Id.*

Third and finally, Arnold requested that the insureds sign affidavits that no other insurance existed which would cover the accident and that Brandon Clayton was not in the course and scope of employment at the time of the accident.[2]  *Id.*

Even though GEICO received Arnold's letter on December 8, 2008, Ms. Toadvine did not review it until two weeks later, on December 22, 2008.  (Dkt. 26-5 at 2; Dkt. 27 at 70-71; Dkt. 26-2 at 25, entry 12/22/08 at 11:12 a.m.).

When she finally reviewed Arnold's letter, Ms. Toadvine sent affidavits requested by Arnold to her insureds via non-expedited, certified mail, for them to execute.  (Dkt. 48-18).  Ms. Toadvine provided the Claytons with a postage-paid, non-expedited return envelope to return the executed affidavits.  *Id.*  The Claytons signed the affidavits before a public notary on December 31, 2008 (New Year's Eve) and returned them to GEICO as requested.  (Dkt. 48-19).  The Claytons had access to a fax machine in December of 2008, and if Ms. Toadvine had faxed the affidavits to them and requested they fax them back to GEICO, Ms. Clayton says her family would have done so.  (Dkt. 48-5 at 58).

GEICO's activity log notes indicate the affidavits were faxed to Arnold on January 5, 2009.

---

[2] A request for this type of information is such a common condition of settlement that GEICO has a form affidavit readily available for its insured to sign which provides exactly this type of affirmation.  (Dkt. 27 at 85-86).

(Dkt. 26-2 at 27, entry of 1/5/09 at 8:40 a.m.).  However, Burnetti, P.A.'s case notes indicate the affidavits were received on January 13, 2009.  (**Ex. A** at Burnetti Notes 0079).

It was not until January 23, 2009[3], <u>forty-six days</u> after receiving Arnold's December 5th letter, that GEICO finally sent a check for the policy limits without Shands included as a payee. (Dkt. 26-6 at 1, 4).  GEICO never provided any ordinance supporting its assertion that Shands was required to be included on the insurance payment, and Ms. Toadvine admitted it was an erroneous representation and Shands should have never been included on the check.  (Dkt. 27 at 40, 81; Dkt. 48-5 at 49).  No explanation is stated in GEICO's claim file as to why it took so long to re-issue the check, and at her deposition Ms. Toadvine (now Ms. Brashears) stated she does not know why the check had not been reissued earlier.  (Dkt. 27 at 96-97, 100-105).

The GEICO response letter states, "**We are unable to remove Christopher Clayton's name off the release as Mr. Clayton signed for Brandon Clayton when Brandon obtained his driver's license.**"  (Dkt. 26-6 at 1).  However, Arnold never requested that Christopher Clayton be removed, rather he requested that Shelley Clayton be removed.   The letter did not address Arnold's request to remove Shelley Clayton from the release and she was in fact still included on the release.  Shelley Clayton did not own the vehicle and did not sign for Brandon's driver's license, and so she had no liability for the accident.  (See **Ex. A** at Burnetti Notes 0078).  GEICO also did <u>not</u> remove "all officers, directors, agents, or employees" from the release.  (Dkt. 26-6 at 1, 3).

On January 27, 2009, Arnold sent a letter to GEICO rejecting its second tender, stating that the  "**offer to settle was received in this office approximately 52 days after our December 5,**

---

[3] The letter is dated 1-22-09, however the attached check shows an issue date of January 23rd.  Ms. Brashears (Toadvine) confirmed the letter was generated on 1-22, but not sent until the check was issued on 1-23. (Dkt. 27 at 106).

**2008 letter…**"   (Dkt. 26-7).

**<u>Lack of Communication</u>**

Shelley Clayton was the family member who was handling the communications with GEICO.  (Dkt. 48-5 at 11-12).  She testified that she did not know how bad the accident was or could be, they didn't know the laws, and were trusting GEICO to tell them what to do. [4]  (Dkt. 48-5 at 19).  Ms. Clayton testified that Ms. Toadvine was not contacting her to explain the process as much as she wished she had, and felt sometimes like they "were on our own".  (Dkt. 48-5 at 20).  Ms. Clayton does not believe GEICO was keeping her reasonably informed of the status of the claim and stated she felt like she had to call GEICO to ask questions to keep an understanding of what was going on, and that GEICO "didn't do what they could have."  (Dkt. 48-5 at 37).

She testified she "felt like we were left in the dark through, you know, all of this up until the O'Hara Law Firm got involved."  (Dkt. 48-5 at 41).  It was not until the O'Hara Law Firm (retained defense counsel for the Claytons) got involved that the Claytons understood the extent of A.W.'s injuries.  (Dkt. 48-5 at 42).  Prior to Wiggins filing a lawsuit against the Claytons, GEICO told the Claytons that A.W.'s claim may exceed policy limits, but not the extent to which it might exceed limits.  (Dkt. 48-5 at 46).  On October 22, 2008, GEICO sent the Claytons a letter that stated, among other things, that "we will make every effort to settle all claims within your coverage limit."  (Dkt. 48-4).  Ms. Clayton testified she relied upon that statement and that GEICO would make every effort to settle the claims.  (Dkt. 48-5 at 47).

On October 30, 2008, Ms. Clayton advised Ms. Toadvine they were considering hiring a lawyer, but decided not to do so because they didn't know the extent of A.W.'s injuries, she

---

[4] Shelley Clayton was unrepresented at her deposition and hadn't spoken with any attorneys prior to her deposition.  (Dkt. 48-5 at 44).

thought the checks had gone out[5], and they assumed it was going to be over and done with. (Dkt. 48-5 at 52-53). On November 12, 2008, Ms. Clayton again advised Ms. Toadvine that they were considering hiring a lawyer, and Ms. Toadvine responded that is their choice and right, and that GEICO would retain counsel for them in the event of a lawsuit. (Dkt. 26-2 at 22, entry of 11/12/08 at 11:32 a.m.). Ms. Clayton thinks they backed off on hiring a lawyer based on Ms. Toadvine's statement that GEICO would provide one if suit were filed. (Dkt. 48-5 at 26, 54). If GEICO had advised Ms. Clayton as of November 11th or 12th, 2008, that A.W.'s injuries were very serious and likely to substantially exceed the policy limits, Ms. Clayton would have hired a lawyer. (Dkt. 48-5 at 55).

GEICO never sent the Claytons Arnold's letter rejecting the second tender of the policy limits. (Dkt. 48-5 at 61). No one at GEICO ever indicated to Ms. Clayton that the possible reason the second settlement check was rejected was due to the length of time it took for GEICO to issue the check. (*Id*.). Ms. Clayton does not believe she was kept fully informed by GEICO of all the issues that were necessary to settle this case. (*Id*. at 74-75).

**Lack of Supervision**

Ms. Toadvine's supervisor during her handling of the Wiggins claim was initially Allen Yates, and later Daniel Latimer. (Dkt. 27 17-18). Mr. Yates relocated form Lakeland to Georgia the second week of December, 2008 (before December 10th). (Deposition of Allen Yates, p. 10-11). Mr. Latimer took over his position on January 3, 2009. *Id*. Thus, Ms. Toadvine was without an assigned supervisor for over three weeks. Mr. Yates did not have any discussions or meetings with any supervisors in connection with his departure to go over the personnel he supervised. (Deposition of Allen Yates, p. 11).

---

[5] Ms. Toadvine indicated to the Claytons that the checks had gone out on October 28, and did not tell them they were delayed until October 31. (Dkt. 48-5 at 53).

According to GEICO's claim activity notes, Mr. Yates' last involvement on the claim was on November 6, 2008, where he appears to have reviewed a property damage payment. (Dkt. 26-2 at 10:51 a.m.). After he made the initial determination that the $25k BI limits should be tendered to A.W. on October 28, 2008, there is no evidence he followed up in any way regarding any efforts to settle the claim. He did not review Arnold's December 5, 2008 letter. (Yates depo, pp. 25-26).

There is no indication in GEICO's claim file that any supervisor actually personally reviewed Arnold's December 5, 2008 letter or attempted to monitor the claim to determine that all three conditions set forth in that letter were timely or accurately met. (*See* deposition of Daniel Latimer, pp. 25-26).

**GEICO had notice of staffing problems giving rise to delays and numerous mistakes in claims handling**

Performance reviews of GEICO's Lakeland, FL regional claims manager[6], Gary Gertz, reveal GEICO was aware of staffing issues which contributed to mistakes in timely handling files, creating extra contractual exposures in the region for the years 2007-2009. The 2007 Self-Performance for Mr. Gertz states:

> **Nearly everything that crosses [CU examiners'[7]] desks seems to have timeliness issues accompanying. In addition, the demands we are receiving from claimant attorneys seem to be coming with more complex conditions and even shorter time frames. This has also significantly added to the pressure created by volume and has caused us (the Managers) to begin secondary and tertiary reviews of the reviews already done. Where does it stop? (rhetorical)**
>
> **By no means are these excuses for some of the mistakes that have been made. There are no excuses for any mistakes that potentially costs the company directly in terms of EC payments and simply sheer number of dollars necessary to defend our "mistakes". These mistakes simply must stop in 2008.**

---

[6] These reviews were made publicly available in *Ford v. Government Employees Insurance Company*, Case No.: 1:14-cv-00180-MW-GRJ (N.D. Fla.). (Dkt. 26-8).

[7] A CU examiner is a "continuing unit" examiner, which is the designation GEICO gives to their adjusters who handle the most complex claims. Ms. Toadvine was a CU examiner at the time of her handling the Wiggins claim.

**We can no longer tolerate a processing/procedural error that has the catastrophic injury attached.**

Mr. Gertz' 2009 mid-year review states:

**As you know, keeping up with the staffing needs for the past 12 months has been a struggle at the CU level.  We continue to promote at a fast pace but this appears to be slowing at this time as growth has subsided – but the claims keep coming.**

(*See* Dkt. 26-9 at 2)[8].

The performance reviews of Yates reveal that he had ongoing problems with keeping up with his work. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████[9]

## GEICO's violations of industry standards

Wiggins' insurance claims practices and customs expert, Peter Knowe, has rendered a number of opinions regarding GEICO's violations of industry custom and practice in its handling of A.W.'s claim.

Mr. Knowe opined that including Shands on the initial check and including parties other than Brandon and Christopher Clayton (the only insureds who had potential liability) violated

---

[8] Mr. Gertz had involvement in the Wiggins claim (*see* Ex. B, log note of 10/30/08 at 2:50 p.m., at GLC 002850).

[9] Wiggins is moving to file Yate's performance reviews under seal due to a confidentiality agreement between Wiggins and GEICO.

insurance industry custom and practice. (*See* Knowe's Rule 26 Report, attached as an exhibit to his deposition, at pp. 7-8).

Additionally, Mr. Knowe opines that GEICO failed to acknowledge and act promptly upon communications with respect to claims. (Knowe depo, p. 64). In particular, the responses to Arnold's December 5 letter by GEICO in January "were untimely per insurance custom and practice and clearly demonstrate the lack of prompt communication response to plaintiff's counsel, which contributed to this claim failing to settle within the available policy limits." *Id.* Knowe stated that failing to review the December 5 letter until December 22 deviates from all custom and practice in timely responding to written communications; that these are critical days that impact the ability of the insurance carrier to protect its insured from excess exposure; that GEICO failed to conduct a reasonable investigation to determine which of its insureds could be subject to legal liability, which led to noncompliance with requested terms of the release; and that GEICO had no reasonable explanation for its delay in sending the nonconforming release and settlement check without Shands as a payee. *Id.* at 68.

Mr. Knowe testified that all of the conditions set forth in Arnold's December 5 letter were reasonable and "that any insurance carrier per insurance custom and practice would have readily accepted and released their insureds almost within a day or two after receiving this letter and reading it." Mr. Knowe stated that generally accepted insurance custom and practice is to review a letter within two days and respond to it within five days. GEICO's training manuals state that

"███████████████████████████████████████████████

████████████████████ (GTM 001319) [10]. GEICO's training manuals further highlight the

---

[10] Wiggins is moving to file GEICO training manuals under seal due to a confidentiality agreement between Wiggins and GEICO.

importance that responses to communications be prompt and fully responsive to all issues raised in the communication:



(GTM 0023).

Mr. Knowe also opined that GEICO's failure to properly staff its claims office and correct mistakes in settlement process over a multiple year period deviates from insurance custom and practice.

Wiggins' other expert witness, Michael Callahan, has practiced law in Florida since 1973, mainly as a defense lawyer in tort cases. (Dkt. 49-4 at 6). In 2014, he became the national president of the American Board of Trial Advocates. *Id*. Although he has never worked in claims for an insurer, over the years he has been involved with home office with different insurance companies, involving drafting strategies for dealing with bad-faith cases, dealing with amendments to policies, dealing with claims practices and procedures, and he has taught seminars for senior management on those subjects for many years. (*Id*. at 7, p. 23.). He has testified as an expert in the areas of both insurance bad faith and legal malpractice. (*Id*. at 8, p. 28).

Mr. Callahan opines that GEICO did not meet its requirements to adequately advise the Claytons regarding the probable outcome of litigation, to warn of the possibility of an excess judgment, and of steps they could take to avoid an excess judgment. (*Id*. at 11, pp. 37-38). Mr. Callahan states it not enough for a carrier to simply warn of a possibility of an excess judgment in

a form letter; rather, the carrier must explain why an excess could result and the steps the insured can take to avoid it. (*Id*. at 14, p. 49-50). In this case, GEICO failed to adequately explain to the Claytons the importance of getting the information requested by Wiggins' attorneys in order to settle the claim, and failed to explain how a personal lawyer could assist in resolving the claim. (*Id*. at 14, p. 49-50).

Based on Ms. Clayton's testimony that had she understood the seriousness of the situation, she would have hired personal counsel, Mr. Callahan has rendered opinions as to the standard of case of personal counsel under the circumstances of this case. He states that given his experience over the years in Florida with tort cases, that any attorney knowledgeable in this area, with probability, would have taken certain actions. (*Id*. at 19, p. 70). Mr. Callahan testified that personal counsel would have promptly identified the problems with including Shands on the check and with the scope of GEICO's release and communicated these issues to GEICO. (*Id*. at 19, p. 71-72). He stated that personal counsel more likely than not would have accomplished all actions necessary to comply with Arnold's December 5 letter in a week. (*Id*. at 20, p. 74; *id*. at 21, p. 79).

**Wiggins was willing to settle A.W.'s claim for policy limits**

If GEICO had promptly responded to Arnold's letter of December 5, 2008 with a check without Shands on it, a release conforming to Arnold's request, and an affidavit of no other insurance and that the driver was not in the course and scope of employment, Arnold "absolutely" would have recommended to his clients that they settle. (Dkt. 48-17 at 31, p. 118). Arnold felt GEICO had tried to take advantage of him by putting Shands on the check and including so many parties on the release, and that by the time GEICO finally responded in late January to his letter of December 5, that the claim had gone on way too long and they had already decided to move forward. (Dkt. 48-17 at 31, pp. 120-21). Wiggins testified that if Arnold had explained to him

that the $25,000 policy limits were all that was available, that GEICO's settlement terms were reasonable, and that Arnold recommended settlement, Wiggins would have settled A.W.'s case for policy limits.  (Tanner Wiggins deposition, p. 78).

### I.     MEMORANDUM OF LAW

#### A.  Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn  in the non-moving  party's favor.  *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1164 (11th Cir.2003).

#### B.  Florida Law on Insurer Bad Faith

##### 1.  Bad faith is premised on the carrier's obligation to act with diligence and ordinary care in settling claims and communicating with its insureds.

In Florida, the insurer's duty of good faith is the equivalent of a fiduciary duty to act in the insured's best interest. *Berges v. Infinity Ins. Co.,* 896 So.2d 665, 677 (Fla. 2004); *State Farm Mut. Auto. Ins. Co. v. Laforet*,  658 So.2d 55, 58  (Fla. 1995); *Doe v. Allstate Ins. Co*., 653 So.2d 371, 374 (Fla.1995) (stating that the obligation of an insurance company toward an insured is a "fiduciary duty requiring the exercise of good faith").

The cause of action for bad faith in Florida harkens back to *Auto Mut. Indem. Co. v. Shaw*, 184 So. 852 (1938).  In *Shaw*, the Court held "that the insurance company in the settlement of claims … should be held to that degree of care and diligence which a man of ordinary care and

prudence should exercise in the management of his own business." *Id*. at 89.  In *Campbell v Gov't Employees Ins. Co*., 306 So. 2d 525 (Fla. 1974) the Florida Supreme Court, citing to *Shaw*, held that "such matters as reasonable diligence and ordinary care were material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact—not of law." *Id*. at 530-31.  Thus, the *Campbell* Court determined that the determination of bad faith is a question of fact for the jury.  *Id*.

In *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783 (Fla. 1980), the Florida expounded upon the carrier's good faith obligations:

> For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.  This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id*. at  785.  The Florida Supreme Court has consistently reaffirmed that the bad faith standard set forth in *Boston Old Colony*.  *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 898 (Fla. 2010); *Macola v. Gov't Employees Ins. Co.*, 953 So. 2d 451, 455 (Fla. 2006); *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 668 (Fla. 2004); *Shuster v. S. Broward Hosp. Dist. Physicians' Prof'l Liab. Ins. Tr.*, 591 So. 2d 174, 176 (Fla. 1992).  Indeed, GEICO's own training manual in this matter confirms the unambiguous pronouncements of bad faith from Florida Supreme Court places heightened duties on the carrier:



(GTM 0039).

It is now well-settled that an insurer must settle a claim against its insured within the policy limits when, under all of the circumstances, it could and should have done so, had it acted fairly and honestly towards its insured and with due regards to the insured's interests. *Berges* at 671 (internal quotation marks omitted). This language is contained within the Florida Standard Jury Instruction. *Fla. St. Jur. Inst.* 404.4.

Moreover, "[t]he lack of a formal offer to settle does not preclude a finding of bad faith." *Powell v. Prudential Property & Casualty Insurance Company*, 584 So.2d 12, 14 (Fla. 3d DCA 1991). "Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Id*.

### 2. GEICO has the burden to prove the claim could not have settled.

Any question about the possible outcome of a settlement effort should be resolved in favor of the insured. *Powell* 584 So.2d at 14. "Insureds are not required, to prove as an element of their bad faith action, that the claim could definitely have been settled within policy limits." *Id.* (citation omitted). Rather, the insurer has the burden to show that there was no realistic possibility of settlement within policy limits. *Id*.; *Lee v. Progressive Express Ins. Co.*, 909 So. 2d 475, 477 (Fla. 4th DCA 2005); *Barry v. GEICO Gen. Ins. Co.*, 938 So. 2d 613, 618 (Fla. 4th DCA 2006); *Geico General Ins. Co. v. McDonald,* 315 Fed.Appx. 181, 183 (11th Cir. 2008); *Estate of Snowden v. Lumbermens Mutual Casualty Compa*. 2d 1125, 1129 (N.D. Fla. 2003).

Finally, the proper "focus of an insurance bad faith case is not on the motive of the claimant, but the insurer in fulfilling its duty to the insured." *Barry v. GEICO General Insurance Company*, 938 So.2d 613, 618 (Fla. 4th DCA 2006) (citing *Berges*, 896 So.2d at 677).

**II.   <u>WHETHER GEICO IS LIABLE FOR BAD FAITH IS A JURY QUESTION</u>**

GEICO admits it knew it needed to make diligent and proactive efforts to attempt to settle A.W.'s claims due to the clear liability to its insureds, the severity of A.W.'s injuries, and likelihood of an excess judgment.  A reasonable jury could conclude that GEICO did not make reasonably diligent efforts to settle A.W.'s claims, and that under the totality of circumstances, GEICO did not act fairly and honestly and with due regard for the interests of the Claytons.  Rather, GEICO's handling of this claim was riddled with mistakes and unreasonable delays, resulting from GEICO's knowing and reckless failure to properly train, supervise, and staff its claims department.

A jury could further determine that if GEICO had made reasonably prompt and diligent efforts to settle the claim, it could have achieved the settlement of A.W.'s claim.

**A.  <u>A reasonable jury could determine under the totality of circumstances, GEICO did not act fairly, honestly, and with due regard for Clayton's interests in attempting to settle A.W. claims.</u>**

Wiggins has offered substantial competent evidence in this case exists that GEICO failed use due diligence and reasonable care in the settlement of A.W.'s claim, including:

- GEICO admittedly improperly included Shands as a payee on the initial settlement check;

- GEICO's release was overreaching in its scope;

- GEICO excessively delayed its response to Arnold's December 5 letter setting forth necessary conditions of settlement;

- Even after its excessive delay in responding to Arnold's letter, GEICO's revised

release still contained errors;

- For more than a year prior to this accident, GEICO was aware that its Lakeland claims office was not completing tasks timely and were making too many mistakes, yet failed to correct the problem;

- GEICO knew Ms. Toadvine's supervisor, Allen Yates, was consistently having problems with time management and completing tasks slowly; and

- settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same.

GEICO's main argument is that it never received a clear demand to settle the case. GEICO's argument is without merit, because "[t]he lack of a formal offer to settle does not preclude a finding of bad faith." *Powell* at 14. GEICO was presented with clear terms that were necessary to settle the case. Even if there was no "formal offer to settle", GEICO was aware of the conditions that were necessary in order for the possibility of settlement to be achieved. It knew A.W.'s claim was severe and presented its insureds with potentially dire financial consequences. Yet it delayed <u>any response at all</u> to Arnold's letter, at best, for nearly one month after the letter was sent, when GEICO faxed the signed affidavits from its insureds to Arnold's office January 3rd (in the light most favorable to Wiggins, the affidavits were not received until ten days after that).

And GEICO did not respond to all of the conditions for settlement set forth in the letter for another 20 days after that, until January 23, 2009, and even then it did not properly address Arnold's requests. GEICO never produced the alleged Alachua County Ordinance that it represented required Shands be included on settlement checks, as Arnold directly requested GEICO to provide, because such Ordinance did not exist. GEICO continued to include Shelley

Clayton on the release even though she had no liability for the accident, and it didn't delete the "catch-all" terminology that Arnold indicated was objectionable (all officers, directors, etc.).

GEICO did not reissue a check without Shands on it until forty-six days after receiving Arnold's December 5th letter, and could offer no reasonable justification for this delay. GEICO's argument that Arnold never specifically requested the check to be reissued is strained and totally without merit. The clear implication of his letter was to either provide the Ordinance or send a check without Shands on it. Moreover, GEICO was obligated to make diligent efforts to attempt to settle the claim, and so a direct request by Arnold for another check was not necessary in order for GEICO to fulfill its good faith obligations. *See Goheagan v. Am. Vehicle Ins. Co.*, 438–39 (Fla.4th DCA 2012) ("The financial exposure to Perkins was a ticking financial time bomb. Suit could be filed at any time. Any delay in making an offer under the circumstances of this case even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith.").

In fact, GEICO understands that its good faith duties do end by simply deciding to pay its policy limits, but rather GEICO must continually exercise its good faith duties:





(GTM 0038-0039) (third emphasis added)**.**

Moreover, by failing to properly advise its insureds of seriousness of the situation and steps necessary to achieve settlement, the Claytons did not hire personal counsel.  The evidence offered by Wiggins' expert, Mr. Callahan, is that personal counsel likely would have taken the steps necessary to achieve settlement.

Finally, a jury could further determine that GEICO's failure to timely and fairly pay the policy limits was a result of a knowing a reckless failure to adequately staff its claims office.

### B.  A reasonable jury could determine that GEICO did not meet its burden to prove there was no realistic possibility of settlement.

Arnold testified that if GEICO had promptly corrected the unacceptable conditions of GEICO's initial settlement offer (Shands on the check, overreaching release terms), and provided the affidavits of its insureds, he "absolutely" would have recommended to his clients that they settle.   Wiggins testified he would have followed his attorney's advice.   Indeed, the contemporaneous notes taken of the conversations between Arnold and Wiggins reveal they were contemplating settlement for the policy limits, and discussing how the settlement would need to be court-approved and subject to equitable distribution.  Arnold went so far as to indicate he would reduce his fees so that Wiggins could have some money to help with A.W.'s care.  Whether GEICO had a realistic opportunity to settle for its policy limits is clearly an issue of fact for the jury.

## CONCLUSION

For the reasons set forth herein, PLAINTIFF, TANNER WIGGINS, as father and legal Guardian of A.W., a minor, respectfully requests that GEICO's motion for final summary judgment be denied.

Respectfully submitted,

/s/SCOTT A. ARHTUR, ESQ.
SCOTT A. ARTHUR, ESQ.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 6, 2017 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: B. Richard Young, Esq., Jordan M. Thompson, Esq., Megan E. Alexander, Esq., and David M. Angley, Esq.  Young, Bill, Boles, Palmer & Duke, P.A., Suntrust Financial Centre, 401 E. Jackson Street, Suite 2950, Tampa, FL   33602,   ryoung@flalawyer.net; jthompson@flalawyer.net; malexander@flalawyer.net dangley@flalawyer.net

**I FURTHER CERTIFY** that I mailed the foregoing document and the notice of electronic filing by U.S. Mail to the following non-CM/ECF participants:  None

/s/SCOTT A. ARTHUR, ESQ.
LEE D. GUNN IV, ESQ.
Florida Bar No.:  367192
lgunn@gunnlawgroup.com
SCOTT A. ARTHUR, ESQ.
Florida Bar No.:  0015889
sarthur@gunnlawgroup.com
GUNN LAW GROUP, P.A.
401 East Jackson Street, Suite 3600
Tampa, FL 33602
(813) 228-7070 TELEPHONE
(813) 228-9400 FAX
Counsel for Plaintiff

Page **21** of **21**